UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOROTHY KEMP,<br>      Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner<br>Social Security Administration,<br>      Defendant. | CIVIL ACTION<br>No. 10-40140-TSH |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S
MOTION TO REVERSE THE DECISION OF THE COMMISSIONER OF SOCIAL
SECURITY (Docket No. 15) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING
COMMISSIONER (Docket No. 19)**
**March 29, 2012**

**HILLMAN, M.J.**

### Nature of the Case

Plaintiff, Dorothy Kemp ("Kemp" or "Plaintiff"), has brought this action against the Defendant, Michael J. Astrue, as Commissioner of Social Security Administration ("Commissioner") seeking judicial review of a final decision by the Commissioner denying her application for Social Security Disability Insurance benefits ("SSDI"). The Commissioner denied Kemp's application on the grounds that her impairments do not render her disabled. Kemp argues that Commissioner's decision to deny her SSDI is not based upon substantial evidence and, therefore, should be reversed and/or remanded for further proceedings. The Commissioner has file filed a motion for an order affirming the decision.[1]

---

[1] A copy of the Administrative Transcript ("*Tr.*")(Docket Nos. 10 & 17) has been provided to the Court under seal.

Kemp filed an application for SSDI on November 3, 2006; she alleged her disabling conditions to be mental illness, severe depression, hydrocephalus and seizures. (*Tr.,* at 107-109, 112). After her application was denied, Kemp ultimately sought a hearing before an Administrative Law Judge ("ALJ"). (*Id.*, at 60-66, 76). A hearing before an ALJ was held on October 12, 2007; on January 25, 2008, the ALJ issued his decision denying Kemp's application (*Id.*, at 12-23). After the Decision Review Board upheld the denial of benefits (*Id.,* at 1-7), Kemp filed a Complaint in this Court, *Kemp v. Astrue*, 08-40119-FDS ("*Kemp I*"), seeking judicial review of the Commissioner's decision. The Commissioner filed a motion to remand (*Kemp I,* at Docket No. 14) on the grounds that the ALJ had failed to properly assess whether Kemp had the ability to return to her past relevant work. This Court (Saylor, D.J.) granted the motion; judgment was entered in favor of Kemp and the matter was remanded for further development of the record. Specifically, the ALJ was instructed to reassess Kemp's ability to return to her past relevant work in light of her residual functional capacity ("RFC") and the demands of her past work. *See Id.,* at Docket No. 15 *(Order of Remand and Entry of Judgment Under Sentence Four of 42 U.S.C.§ 405(g) With Reversal and Remand of the Case to the Defendant. Kemp filed an appeal in District Court).*

A rehearing was held before the same ALJ on December 11, 2009. Kemp's attorney agreed that there was no further need for testimony on the issue of Kemp's past work, nor was there any additional evidence to be submitted on that issue. *Id.*, at 468-69. Testimony was taken from a vocational expert ("VE"). (*Id.*, at 470-77). On January 29, 2010, the ALJ issued a decision in which he again denied Kemp's application for benefits; the Decision Review Board upheld the ALJ's decision. (*Tr.*, at 434-36, 441-53).

**Findings of Fact**

The ALJ determined that the claimant last met the insured status requirement of the Social Security Act ("Act") on December 31, 1996. Neither party disputes this finding.

### 1. *Educational and Occupational History*

Kemp was born on January 22, 1958 and for all relevant times, resided in Sturbridge, Massachusetts with her husband and two children. Kemp did not graduate from a high school, but obtained a general equivalency degree ("GED") in 1975. (*Id.*, at 119). Kemp's past *relevant* work, *i.e.,* work that she was performing as of the date last insured, can been characterized as "office clerk/helper," which is "unskilled work performed at the light exertional level." (*Id.*, at 451).

### 2. *Medical History*

Kemp's significant medical treatment history began at age twenty with two episodes of anxiety related hospital visits in 1978 and 1980 (*Id.*, at 431-433). On June 15, 1994, Kemp received medical attention for anxiety, panic and other mental issues. (*Id.*, at 385, 420-426). Medical notes from an April 20, 1995, examination identify "mild depressive reaction" and "general malaise" to be affecting Kemp's mental state. (*Id.*, at 375). Additional medical notes from September 14, 1995, October 12, 1995 and December 19, 1995, examinations identify Kemp as having "depressive neurosis." (*Id.*, at 372, 397-98). Kemp also received emergency medical attention on July 14-15, 1996, for acute intoxication, depression and other related symptoms of anxiety related to her husband telling her he was divorcing her. (*Id.*, at 408-413). Subsequent medical records from November 12, 1996, also indicate Kemp suffered from anxiety and stress. (*Id.*, at 396).

The record reflects that beginning in January 2000, Kemp began to have more frequent and acute episodes of depression, anxiety and panic attacks for which she sought and received medical treatment. More recently, she has been under the care of a treating psychiatrist, Dr. Tina Render. (*Id.*, at 276, 281, 287, 289, 291-298, 301, 366, 351).[2]

Kemp has been diagnosed with hydrocephaly, secondary to aqueductal stenosis. (*Id.*, at 303, 308). It appears that this condition was first diagnosed sometime in 2001. (*Id.,* at 302-03.)

On February 1, 2007, Kemp was referred for an assessment of her RFC. (*Id.*, at 351). However, the evaluator determined that there was insufficient medical evidence to complete the assessment. (*Id.,* at 352, 364).

On October 6, 2008, a former treating physician, William H. Lundy, M.D., provided Kemp's counsel with a psychiatric evaluation; Dr. Lundy believed that he had treated Kemp either in 1994 or 1995 (he could not be more specific because his office destroys medical records within eight years of termination of the patient relationship). (*Id.* at 483-85). Dr. Lundy noted that Kemp currently had primary working diagnosis of agoraphobia with panic attacks and recurrent major depression. Dr. Lundy's "imperfect memory" was that in 1994 or 1995, Kemp was exhibiting psychiatric symptoms which are similar to those "currently displayed and described in July 2008." (*Id.*, at 484). He also noted that when he had seen her, he considered that she may have been exhibiting signs of bi-polar disorder and/or post traumatic stress

---

[2]In August 2005, Dr. Render completed a statement of disability regarding Kemp. Dr. Render stated that Kemp suffered from panic disorder with agoraphobia, major depression (recurrent) and post traumatic stress disorder; Dr. Render opined that Kemp was disabled and would be unable to return to work for 13-24 months. (*Tr.*, at 366). On December 13, 2006, Dr. Render diagnosed Kemp as suffering from: major depression (recurrent); chronic post traumatic stress syndrome; panic disorder with agoraphobia; and organic personality disorder. Dr. Render opined that at that time, Kemp was unable to work due to psychological and neurological problems. (*Id.,* at 289). On May 7, 2007, Dr. Render diagnosed Kemp as suffering from: major depression (recurrent); chronic post traumatic stress syndrome; and panic disorder with agoraphobia. Dr. Render opined that at that time, Kemp was unable to maintain gainful employment; Dr. Render expected that Kemp's condition would last at least 12 months and could be permanent. (*Id.,* at 287).

4

syndrome. He also noted that her memory and concentration appeared to have deteriorated since he had been seeing her. (*Id.*). He believed that Kemp had suffered from bouts of incapacitating severe anxiety and depression for perhaps a minimum of fourteen years. (*Id.*) Finally, Dr. Lundy noted that "her specific symptoms can vary from time to time and make prognostication problematic in general. However *recently* the patient's symptom complex seems worse, she suffers more cognitive problems, and she is not driving and pretty much housebound." (*Id.*)(emphasis added) Dr. Lundy opined that Kemp is *currently* unable to engage in any gainful employment and that "this state of affairs has far exceeded 12 months". (*Id.,* at 485).

### 3. *Daily Activities*

During the relevant period, Kemp was unable to drive on highways, and had difficulty driving in general. (*Id.*, at 42). Furthermore, she has stated that she was unable to complete tasks, suffered from severe headaches, dizziness, tinnitus and incontinence that also limited her ability to lead a productive and normal life. (*Id.*, at 163-68, 310).

### 4. *VE's Testimony*

The ALJ presented the VE with a number of hypotheticals. Initially, he asked the VE to assume the following facts:

- A thirty-eight year old individual with a GED and some training as an esthetician and whose past relevant work was unskilled at the light exertional level.

- The individual had a past history of various gastrointestinal and digestive problems with indications of reactive depression described by the primary care physician as depressive neurosis with features of anxiety and panic attacks.

- No exertional limitations are to be imposed, but the individual is limited to one to two step tasks and no more than occasional interaction with co-workers and supervisors and none with the public.

(*Id.,* at 474).

5

The VE testified that the individual would not be able to perform Kemp's past relevant work as an office helper, because that would require regular contact with co-workers. (*Id.*). Kemp would, however, be able to work as: (i) a small products assembler (200 such positions would be available in Western and Central Massachusetts and 44,000 nationally); (ii) a classifier, *i.e.,* someone who sorts laundry in a commercial laundry (approximately 200 positions available in Central Massachusetts and 10,000-20,000 nationally); and (iii) a press operator doing commercial laundry (approximately 200 in Central Massachusetts and 69,000 nationally). (*Id.*, at 474-75).

The ALJ then amended the hypothetical to provide that the position would require only rare occasions of interaction co-workers or supervisors, essentially, working in isolation. The VE testified that Kemp would not be able to perform her past relevant work, but there are job in the national or regional economy that such an individual could perform such as: (i) a surveillance system monitor (no data for Massachusetts, 90,000 nationally); (ii) a classifier, *i.e.,* someone who sorts laundry in a commercial laundry (approximately 200 positions available in Central Massachusetts and 10,000-20,000 nationally); and (iii) a press operator doing commercial laundry (approximately 200 in Central Massachusetts and 69,000 nationally). (*Id., at 475*).

Noting that the VE had already limited the individual to essentially light, sedentary work, the ALJ then suggested the following additional limitations: due to distractions from pain, and emotional consternation due to anxiety and depression, the individual is unable to maintain sufficient concentration, persistence and pace to complete a normal eight hour day. (Id., at 476). The VE testified that as to this individual, there would not be any positions existing in significant numbers that would be considered substantial gainful activity within the meaning of the Act. (*Id.*).

Finally, the ALJ added the following limitations: due to distractions from pain, and emotional consternation due to anxiety and depression, the individual has to either leave work prior to the usual quitting time or be completely absent and this would occur on a regular basis for at least three occasions each month (either leaving early or not showing up at all). *(Id.)*. The VE testified that there would not be any positions existing in significant numbers that would be considered substantial gainful activity within the meaning of the Act. *(Id.)*

### *ALJ's Findings*

The ALJ made the following determinations:

    (1) The claimant met the Act's insured status requirements on December 31, 1996 (her date last insured).

    (2) The claimant has not engaged in "substantial gainful" employment from September 6, 1995 (date of alleged onset of disability) through date of last insured.[3]

    (3) The claimant has "evidence of generalized anxiety disorder with a history of panic attacks, intermittent depressive disorder – designated a neurosis, and intermittent alcohol abuse."

    (4) The claimant did not have an impairment or combination of impairments that met or medically equaled one from the list of impairments nor did she reach the level of a "marked limitation" that is more than moderate, but less than severe which would qualify her for disabled status.

    (5) The claimant has moderate and mild limitations, which preserves her "residual functional capacity to perform a full range of work at all exertional levels."

    (6) That from the date last insured, the claimant did not and was unable to perform any past relevant work.

    (7) The claimant's past relevant work is unskilled, so the transferability of job skills is irrelevant in the circumstance.

    (8) There are jobs in significant numbers in the national economy that the claimant can perform based on her residual capacity level.

---

[3] The ALJ found that Kemp "did engage in some work activity from 2001 to 2005, this was subsequent to the date last insured and reflective of work at less than the substantial gainful activity level." (*Tr.,* at 446).

7

(9) The claimant was not disabled at the alleged onset date and date last insured in compliance with the Act.

(*Id.*, at 444-453).

## **Standard of Review**

### *Affirmance or Reversal of Commissioner's Decision*

Under § 205(g) of the Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. *See* 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the court, to find facts, decide issues of credibility, draw inference from the record, and resolve conflicts in the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate ... to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro* v. *Sec'y of HHS.*, 76 F.3d 15, 16 (1st Cir. 1996).

### *Standard for Entitlement to Disability Insurance Benefits*

In order to qualify for disability insurance benefits, a claimant must demonstrate that the he is disabled within the meaning of the Act. The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only his past work, but any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1). Furthermore, to be entitled to SSDI, a claimant is eligible for benefits where s/he demonstrates that s/he was disabled on or before the date before which s/he was last insured. 42 U.S.C. § 423(a)(1)(A). The claimant has the burden of establishing that s/he was disabled before expiration of his/her insured status. *Brunson v. Astrue*, 387 Fed.Appx. 459 (5th Cir. 2010).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in [Appendix 1 of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> These first three tests are "threshold" tests. If the claimant is working or has the physical or mental capacity to perform "basic work-related functions," he is automatically considered not disabled. If he has an Appendix 1-type impairment, he is automatically considered disabled. In either case, his claim is determined at the "threshold." If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no "Appendix 1" impairment (test 3), the SSA goes on

9

> to ask the fourth question:
>
> Fourth, does the claimant's impairments prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy. *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In making that determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

## **Discussion**

The parties do not dispute that Kemp has not been engaged in substantial gainful employment since December 31, 1996, that she has severe impairments, that she does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, and that her impairment prevents performing in any past employment. Disagreement arises, however, in connection with step five of the sequential evaluation process, *i.e,* the evidence relied on by the ALJ in making his decision as to whether Kemp's impairment prevents her from performing other work of the sort found in the economy.

## Scope of the Issues Raised In Kemp's Appeal

In support of her motion to reverse/remand, Kemp asserts that the ALJ's decision is not supported by substantial evidence, first, because the ALJ failed to preserve a medical opinion that was favorable to her and he failed to contact the treating physician who wrote the letter to clarify the basis of his opinion before disregarding it as ambiguous or unsupported, and second, the ALJ erred by ignoring her alleged impairment of hydrocephalus. The Commissioner, on the other hand, asserts that the decision denying Kemp benefits should be affirmed because it is supported by substantial evidence.

## Whether The ALJ Erred By Failing To Preserve Dr. Lundy's Letter

First, Kemp alleges that the ALJ did not preserve the medical opinion of her former treating psychiatrist, Dr. Lundy. Current counsel did not represent Kemp at the hearing and inexplicably, was unable to locate a copy of the letter. Kemp asserts that because the letter was not preserved by the ALJ, she is unable to challenge the ALJ's findings. However, the letter was, in fact, preserved, but was inadvertently omitted from the official record. After Kemp filed her motion to reverse/remand the Commissioner's decision, the Commissioner filed a *Notice of Supplemental Administrative Transcript* (Docket No. 17), which included Dr. Lundy's letter. Given that the letter is now part of the official record, Kemp could have sought leave to file a reply brief to supplement her argument that the ALJ failed to properly consider Dr. Lundy's medical opinion. She did not do so[4]. Under the circumstances, I cannot find that Kemp was prejudiced by the belated inclusion of Dr. Lundy's letter.

---

[4] Indeed, in his opposition, the ALJ expressly suggested that Kemp file a reply brief if she desired to supplement her argument.

### *Whether the ALJ erred By Failing to Contact Dr. Lundy Concerning His Letter*

The ALJ considered Dr. Lundy's evaluation, however, he did not find Dr. Lundy's opinion persuasive because: (i) Dr. Lundy's treatment notes had been destroyed; (ii) Dr. Lundy admitted he had an "imperfect memory" concerning Kemp's symptoms and treatment, and much of his evaluation appeared to be based on speculation; and (iii) Dr. Lundy made multiple references to the fact that Kemp's symptoms had *recently* worsened. (*Tr.,* at 450). Kemp argues that the ALJ erred by disregarding the opinion of Dr. Lundy, a treating physician, as insufficient, unsupported or ambiguous without seeking further clarification.

Kemp argues given the non-adversarial nature of the proceedings, the ALJ had a duty to investigate the facts and develop the arguments both for and against granting benefits and that his failure to do so requires this case to be remanded for further proceedings. *See Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S.Ct. 2080 (2000) (stating "Social Security proceedings are inquisitorial rather than adversarial" and ALJ must "investigate the facts and develop the arguments both for and against granting benefits."). In support of her argument, Kemp cites to governing regulations, specifically, 20 C.F.R. §§404.1512(e), 416.912(e), which she asserts required the ALJ to contact Dr. Lundy to ascertain the basis for his assessment and opinion. Further, because according to Kemp Dr. Lundy was her treating physician, he is in a unique position to provide the most accurate portray of what her actual medical impairments were during the relevant time period and therefore, the ALJ was required to assess his report with "more weight" than a non-treating medical expert. 20 C.F.R. § 404.1527 (d)(1) and (2).

Dr. Lundy's opinion was vague and given his sketchy recollection of Kemp's treatment, appears to be based on rank speculation. More importantly, Dr. Lundy expressly states that based on his recollection of Kemp's symptoms when he was treating her, *in either 1994 or 1995,*

her condition has worsened. Although he concludes that currently she would not be able to engage in any kind of employment and that she would not have been able to do so for far in excess of twelve months, he never suggests that at the relevant time period, her conditions would have prevented her from engaging in gainful employment. Under these circumstances, the ALJ gave appropriate weight to Dr. Lundy's opinion. Furthermore, the ALJ was warranted in finding Dr. Lundy's opinion was not persuasive.

As to Kemp's argument that the ALJ should have contacted Dr. Lundy to obtain more information and/or to clarify any open issues concerning her mental health during the relevant time period, it is not clear what purpose would have been served in contacting Dr. Lundy. It is true that the regulations provide that when the evidence received from a claimant's treating psychologist is inadequate for the ALJ, to determine whether the claimant is disabled, the ALJ will contact the treating psychologist "*to determine whether the additional information we need is readily available*." 20 C.F.R. §404.1512(e)(1). First, the basis for Dr. Lundy's opinion was clear to the ALJ, that is, the ALJ could ascertain from Dr. Lundy's evaluation the sources that he relied on in reaching his conclusions. Therefore, it is not clear that the ALJ's obligation to re-contact Dr. Lundy was triggered. *See Cortes-Vazques v. Astrue*, 10-11092-JLT, 2011 WL 3652771 (D.Mass. Jul. 21, 2011)(ALJ is required to re-contact treating physician to seek additional evidence or clarification when ALJ is unable to discover evidentiary basis for treating source's opinion). In any event, the regulation goes on to provide that the ALJ "may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings." *Id.,* 1451(e)(2). In this case, Dr. Lundy had expressly stated that his treatment records had been destroyed and it is clear from the letter that his memory concerning Kemp's symptoms and treatment was, at best,

"imperfect". Given that there were no medical records available to support any findings made by Dr. Lundy, it was not necessary for the ALJ to contact him.

*Whether ALJ Erred By Failing To Consider That The Claimant Suffered From Hydrocephalus*

Kemp's application for benefits stated that she suffered from hydrocephalus in addition to other medical illnesses that result in her inability to participate in substantial gainful activity. However, Kemp was not diagnosed with hydrocephalus until 2001, well after the her date last insured. Furthermore, there is nothing in the medical evidence in the record to even suggest that she was suffering from symptoms relating to that condition prior to her date last insured.[5] Therefore, there was no error.

## Conclusion

For the foregoing reasons, the Plaintiff's Motion To Reverse The Decision Of The Commissioner Of Social Security (Docket No. 15) is ***denied*** and Defendant's Motion For Order Affirming Commissioner (Docket No. 19) is ***allowed***.

/s/ **Timothy S. Hillman**
TIMOTHY S. HILLMAN
MAGISTRATE JUDGE

---

[5] Kemp states that the record supports a finding that suffering from hydrocephalus affects her activity of daily living including her ability to sleep due to headaches, dizziness and tinnitus. Assuming such to be the case, there is nothing in the record to support a finding that the condition restricts her ability to work. Furthermore, it is not clear from Kemp's argument what restrictions the VE should have considered relative to this condition.